AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

<table>
<tr><td>

**LODGED**
CLERK, U.S. DISTRICT COURT

**12/04/2020**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____AP_____ DEPUTY

</td></tr>
</table>

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| Donald Alfonso Allen,<br>Winston Biggs, | Case No.  5:20-mj-00637 |
| Defendants | |

<table>
<tr><td>

**FILED**
CLERK, U.S. DISTRICT COURT

**DEC 4 2020**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____DTS_____ DEPUTY

</td></tr>
</table>

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of July 29, 2020 in the county of Riverside in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii) | Possession with intent to distribute at least 500 grams of a mixture or substance containing cocaine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ signed pursuant to Fed. R. Crim. P. 4.1
_____
*Complainant's signature*

Anthony Herrera Jacobs, Postal Inspector
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    December 4, 2020 at 5:27 PM

_____
*Judge's signature*

City and state:   Riverside, California

Hon. Kenly Kiya Kato, U.S. Magistrate Judge
_____
*Printed name and title*

## **AFFIDAVIT**

I, Anthony Herrera Jacobs, being duly sworn, declare and
state as follows:

## I. **PURPOSES OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal
complaint against DONALD ALFONSO ALLEN ("ALLEN") and WINSTON
BIGGS ("BIGGS") for violations of Title 21 United States Code,
Sections 841(a)(1), (b)(1)(B)(ii) (possession with intent to
distribute at least 500 grams of a mixture or substance
containing cocaine) on or about July 29, 2020.

2.   This affidavit is also made in support of an
application for a warrant to search the following seven digital
devices (collectively, the "SUBJECT DEVICES"), in the custody of
the Riverside Police Department in Riverside, California, as
described more fully in Attachment A:

a.   A black iPhone model A1784 ("SUBJECT DEVICE 1");

b.   A pink iPhone bearing serial number F2LTTF5ZHG07,
("SUBJECT DEVICE 2");

c.   A black iPhone bearing serial number FCLD206WN70F
("SUBJECT DEVICE 3");

d.   A black iPhone bearing serial number F71QGZ95GRY5
("SUBJECT DEVICE 4");

e.   A gray iPad bearing serial number DMPCH0E4NTJ2
("SUBJECT DEVICE 5");

f.   A gray Samsung Galaxy smartphone bearing serial
number R28JC2M2KSN ("SUBJECT DEVICE 6"); and

g.   A black Samsung Galaxy smartphone bearing serial number R28JC1N9Z3L ("SUBJECT DEVICE 7").

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute, or distribution of, a controlled substance), 843(b) (use of communication facility to commit drug offense), and 846 (conspiracy to possess with intent to distribute, or distribute, a controlled substance) (collectively described as the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and criminal complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF POSTAL INSPECTOR JACOBS

5.   I am a United States Postal Inspector ("Postal Inspector") employed by the Los Angeles Division of the United States Postal Inspection Service ("USPIS").  I joined USPIS in August 2003.  I have completed a twelve-week Postal Inspector

basic training course, which included training in the investigation of narcotics trafficking via the United States Mail. I also have completed an advanced training course specifically designed for training investigators of narcotics mailers and shippers. I am currently assigned to the USPIS Los Angeles Division, Narcotics Team and Parcel Task Force, which is responsible for investigating drug trafficking organizations that use parcels to distribute illegal narcotics and/or narcotics proceeds. As part of my law enforcement duties, I have conducted numerous parcel investigations that have resulted in the arrest of individuals who have received and distributed controlled substances, as well as the seizure of the illegal drugs and proceeds from the sale of those illegal drugs.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

6.   On July 29, 2020, BIGGS shipped a parcel with ALLEN's fingerprint inside at a Post Office in Lake Elsinore, California using a United States Postal Service ("USPS") Priority Mail Express service. The parcel was marked with USPS tracking number EJ399849306US and mailed to Greenville, South Carolina. On July 30, 2020, I searched the parcel pursuant to a federal search warrant and found that it contained approximately 2,093 gross grams of a substance later determined to be cocaine. On November 30, 2020 and December 1, 2020, ALLEN entered a Postal Annex store in the city of Menifee where he shipped additional parcels containing cocaine to New Jersey. On December 2, 2020, Riverside Police Department ("PD") officers executed a search warrant at ALLEN's home and BIGGS's motel room. Officers found

large quantities of cash and drugs at ALLEN's home, and found large quantities of cash and shipping materials inside BIGGS's motel room.

## IV. STATEMENT OF PROBABLE CAUSE

7.    Based on my conversations with other law enforcement officers and my own knowledge of the investigation, I am aware of the following:

**A.    July 29, 2020:  BIGGS Ships Cocaine Parcel via USPS**

8.    On July 29, 2020, during routine parcel screening at the San Bernardino Processing and Distribution Center, I identified a parcel as exhibiting several indicia that I know, based on my training and experience, indicated that the parcel may contain drugs or drug-trafficking proceeds.  The parcel was a large brown cardboard box, weighing 6 pounds 7 ounces, addressed with a handwritten label to "Sandra Wallace Jay Wynn Hair Products, 1427 Laurens Road Suite L, Greenville, SC 29607," with a return address of "Andrew Sullivan, 4548 Brdilepoint Pkwy, Snellville Ga 30039".  The parcel was shipped for $84.90, which was paid in cash.

9.    I searched law enforcement databases and found that the name "Andrew Sullivan" was not associated with the (true) address of 4548 Bridle Point Parkway address in Snellville, Georgia.  I also determined that the name "Sandra Wallace" was not associated with the address 1427 Laurens Road Suite L in Greenville, South Carolina.

10.    I coordinated with Riverside PD Detective Scott Levesque to have a trained drug-detection dog sniff the parcel

for the presence of drugs.  The dog arrived and alerted to the
parcel, indicating that drugs or items contaminated with drugs
were enclosed within.  On July 30, 2020, the Honorable Kenly
Kiya Kato, United States Magistrate Judge for the Central
District of California, signed a warrant authorizing a search of
the parcel.  On July 31, 2020, Postal Inspectors opened the
parcel and found approximately 2,093 gross grams of a white
powdered substance inside.  The substance was packed with a
unique rigid foam insulation material.  Postal Inspectors
conducted a field test of the substance, which yielded a
positive result for the presence of cocaine.  That same day I
forwarded the parcel and its contents to the USPIS drug
laboratory in Dulles, Virginia for further analysis.

     11.  On August 19, 2020 Detective Levesque went to the Lake
Elsinore Post Office and obtained copy of the video surveillance
from July 29, 2020.  The video showed a middle-aged black male
with dreadlocks (later identified as BIGGS) mailing a box which
looked identical to the parcel containing cocaine.  A USPS
clerk told Detective Levesque that the person who mailed the
parcel has mailed numerous parcels from that USPS location and
always paid for the shipment of those parcels using cash.

     B.   **Investigation Reveals that ALLEN Lives on Swift Street**

     12.  USPS offers customers the ability to track the status
of certain packages either online or via telephone.  Knowing
this, I reviewed USPS records to see if the parcel containing
cocaine had been tracked using this service.  USPS records
indicated that the online service had in fact been used to track

the parcel.  I then reviewed these records to see if I could
isolate an Internet Protocol[1] ("IP") address which was used to
track the location of the parcel containing cocaine which was
shipped on July 29.  I successfully isolated an IP address, then
noticed that the same IP address was used to track a second
parcel, which was being shipped from Piedmont, South Carolina to
27074 Swift Street in Menifee, California.[2]  Based on my training
and experience and the timing and location of this second
parcel, I believed that the second parcel was likely payment for
the narcotics BIGGS had shipped on July 29.

---

[1] "Internet Protocol" is the primary protocol upon which the Internet is
based.  IP allows a packet of information to travel through multiple networks
(groups of linked computers) on the way to its ultimate destination.  An IP
Address refers to a unique numeric or alphanumeric address used to connect to
the Internet.  IP Addresses can be "dynamic," meaning that the ISP assigns a
different unique number to a device every time it accesses the Internet, or
"static," meaning an ISP assigns a user's computer a particular IP address
that is used each time the computer accesses the Internet.

There are two versions of IP addresses:  IPv4 and IPv6.  IPv4 is the most
widely used IP, and uses four groups of numbers separated by periods in a 32-
bit address scheme (e.g., 121.56.97.178).  IPv6 uses colons to separate eight
alphanumeric groups (e.g., 2001:0:1760:e3e7:1858:2cea:d075:6c4c).  In a
simple example, one computer in a home may connect directly to the Internet
with an IP Address assigned by an ISP.  What is more typical is that one home
may connect multiple digital devices to the internet simultaneously,
including laptops, tablets, smart phones, smart televisions, and gaming
systems. Because the home subscriber typically only has one Internet
connection and is only assigned one IP Address at a time by their ISP,
multiple devices in a home connect to the Internet via a router or hub.  The
devices connect to the router or hub, and the hub connects to the Internet.
Internet activity from every device attached to the router or hub is using
the same external IP Address assigned by the ISP.  The router or hub "routes"
Internet traffic so that it reaches the proper device.  Most ISPs control a
range of IP Addresses.  Most ISPs maintain records of which subscriber was
assigned to which IP Address during an online session.

[2] Greenville, South Carolina and Piedmont, South Carolina are
approximately 13 miles apart from one another.

13.   On August 18, 2020, Detective Levesque drove to the 27074 Swift Street address and found that there was a home located at the address.  Detective Levesque noticed a recycle bin sitting on the curb outside of the home.  Inside the recycle bin, Detective Levesque saw numerous pieces of what he recognized as the rigid foam insulation identical to that which was used for the packaging of the parcel with cocaine.

14.   On September 10, 2020 Detective Levesque conducted surveillance at the 27074 Swift Street address in Menifee.  At about 10:00 a.m., an unidentified man (later identified as ALLEN), pulled out of the garage in a Ford Taurus.  Detective Levesque ran the Taurus's registration and determined that the car was registered to K.C., who maintained addresses in California and New Jersey.  Detective Levesque followed the car to Lake Elsinore, California, where the car pulled into the entrance of a Best Western Hotel.  The man left his Taurus parked in the driveway area and entered the hotel.

15.   The man was inside about 15 minutes, then came back to the car and began driving back towards Menifee.  The man was subsequently stopped by a Riverside County Sherriff's Department ("RCSD") officer for a routine traffic violation.  The driver showed the officer a Florida driver's license displaying the name "W.N.", with a date of birth of July 10, 1970, and a Florida Driver's License number N620880702500.  Through subsequent investigation, I determined that W.N. is a real

person, and I believe that ALLEN has been using W.N.'s identity
without authorization.[3]

16.   After ALLEN had returned to his home on Swift Street,
Detective Levesque stayed at the location and continued to
perform surveillance.  At approximately 12:15 p.m. the same day,
Detective Levesque noticed a silver Volkswagen pull up to the
Swift Street home.  Detective Levesque then realized that the
man driving was the same man from the July 29 surveillance
footage (later identified as BIGGS).  The man then got out of
the Volkswagen and walked into the home.

17.   At about 6:15 p.m., the man left the home and began
driving towards Lake Elsinore in the Volkswagen, eventually
stopping at the Quality Inn at 31808 Casino Drive in Lake
Elsinore.  For the next two months, Detective Levesque conducted
surveillance at the Quality Inn and determined that the man was
spending the majority of his time at the Quality Inn and was
using the Quality Inn as his primary residence as late as
November 30, 2020.

18.   Detective Levesque conducted surveillance at the Swift
Street address several more times in September 2020 and
determined that ALLEN was likely the only person living in the
home.  Detective Levesque noticed that BIGGS visited the home on
at least ten subsequent occasions throughout this time.

---

[3] After learning ALLEN's true identity through fingerprint analysis, as
described later in this affidavit, I reviewed ALLEN's criminal history and
determined that ALLEN was an undocumented immigrant who had previously been
deported to Jamaica for seizure of weapons and cocaine.  I also learned that
ALLEN had previously been prosecuted in New Jersey for domestic violence.

**C.  USPIS Lab Identifies Fingerprints inside the Parcel**

19.  On September 11, 2020 I received a lab report from Lynsey Mickolas, a certified forensic chemist at the USPIS lab in Dulles, Virginia.  Mickolas determined the substance I had previously shipped for further analysis had tested positive for 1999.2 grams of a substance containing cocaine.

20.  On November 22, 2020, I received an email from Patricia Cornell, the Senior Forensic Print Analyst at the same laboratory, informing me that she had identified several latent fingerprints on the packing material inside the cocaine parcel. Ms. Cornell reported that she had compared the fingerprints on the packing material to the FBI's fingerprint database and found two matches.  Specifically, Ms. Cornell determined with a reasonable degree of scientific certainty that five fingerprints on the packing material belonged to ALLEN, and that four fingerprints on the interior of the box which housed the cocaine and packing material belonged to BIGGS.

21.  When I learned that ALLEN's fingerprints were found inside the parcel that BIGGS had shipped, I had my analyst search for ALLEN's photograph in the New Jersey Department of Motor Vehicles ("DMV") database by using his FBI Identification Number.  I then obtained and compared ALLEN's New Jersey DMV photograph to the man depicted in the Florida Driver's license as "Wade Nurse" and determined that they were the same person.

### D.   BIGGS Ships Marijuana Parcel to Georgia, and ALLEN Ships Cocaine to South Carolina and New Jersey

22.   On November 19, 2020, a USPS clerk at the Sun City, California Post Office contacted Detective Levesque to tell him that she recognized BIGGS shipping out suspicious parcels at her Post Office.  Detective Levesque reviewed surveillance footage from that date and identified BIGGS as the person shipping a parcel using USPS Express mail.  This time, BIGGS was shipping the parcel to "Angela Campbell, 6432 Berryside Drive, Lithonia, GA 30058" with a return address of "Andrew Spencer, 27063 Swift St, Menifee CA 92584".  A search of "Andrew Spencer" revealed that "Andrew Spencer" was not associated with the "27063 Swift St" address.  Because the parcel was already in transit to Georgia, I coordinated with Postal Inspectors in Georgia to have the parcel set aside.  Postal Inspectors in Georgia obtained a certified and trained drug detection dog, and the dog alerted to the parcel indicating that drugs or items contaminated with drugs were present inside.  Postal Inspectors obtained a federal search warrant in South Carolina and opened the parcel, revealing nine ounces of a green leafy substance which field-tested positive for marijuana.

23.   On November 24, 2020, United Parcel Service ("UPS") management alerted HSI in South Carolina that a parcel, bearing UPS tracking number 1ZKTV5800124021035, was processed at the UPS facility in Greenville, South Carolina.  The parcel was addressed from "Britteny Lawson" at 35175 Fennel Lane, Lake

Elsinore, California, to "Sharon Fallon" at 205 Katrina Court, Piedmont, South Carolina.

24.  HSI Task Force Officers ("TFOs"), utilizing a narcotics detection dog, performed a sweep of the outside of the parcel.  The dog positively alerted to the odor of narcotics. The TFOs then obtained a search warrant from a local state court and opened the parcel.  Inside, TFOs discovered approximately 1,289 grams of a white powder that field-tested positive for cocaine.  The TFOs also discovered approximately 550 grams of a substance which field-tested positive for marijuana.

25.  UPS Security Manager Patrick Baxter investigated the history of the parcel containing cocaine and marijuana and determined that it had been shipped from a Postal Annex retail store at 30141 Antelope Rd, Unit D in Menifee, California. Detective Levesque reviewed video surveillance from that Postal Annex and positively identified the person shipping the parcel as ALLEN.

26.  On November 30, 2020, Detective Levesque received information from UPS management that ALLEN dropped off another parcel at the same Postal Annex. The parcel was marked with UPS tracking number 1ZP5J7T21309632022 and addressed to "James Sinclaire 24B 676 Park Avenue, East Orange NJ 07017" with a return address of "Millicent Sinclaire 9516799920, Sun City Boulevard, Menifee CA".  A trained drug-detection dog then alerted to the parcel, indicating that drugs or items contaminated with drugs were enclosed within.  On December 1, 2020, Levesque obtained a search warrant signed by Riverside

Superior Court Judge Mac Fisher for the parcel.  The same day,
Detective Levesque opened the parcel and discovered
approximately 5,000 grams of a white powdery substance in brick
form, which field-tested positive for the presence of cocaine.
On December 2, 2020, I and Detective Levesque reviewed video
surveillance of the Postal Annex store and we identified ALLEN
as the person shipping the parcel.

27.  On December 1, 2020, UPS management contacted
Detective Levesque and told him that ALLEN had shipped five more
parcels at the same Postal Annex store located at 30141 Antelope
Rd, Unit D, in Menifee.  A trained drug-detection dog then
alerted to the parcels, indicating that drugs or items
contaminated with drugs were enclosed within.  On December 2,
2020, Detective Levesque obtained a search warrant signed by
Riverside Superior Court Judge Mac Fisher for the parcels.

28.  That same day Levesque opened the parcels.  The first
had been labeled with UPS tracking number 1Z0GT43W1320025819 and
was addressed to "Bridgette Malcom, Apt 11 190 North park Street
East Orange, NJ 07017" with a return address of "Rochelle Smith
4703559302, 111 Sandpoint Lane Riverside CA 92506".  The parcel
contained approximately 5,000 grams of a white powdery substance
in brick form, which field-tested positive for the presence of
cocaine.  A powered-on cell phone was also inside the parcel,
possibly being used as a tracking device.

29.  Detective Levesque then opened the next parcel, which
was labeled with UPS tracking number 1Z0GT56Z150005418 and
addressed to "Joan Campbell, 1326 White Horse Road, Greenville

12

SC 29605" with a return address of "Adrianne Thomas, 9517684206, 31505 Emperor Drive, Canyon Lake, CA 92587". The parcel contained approximately 1,000 grams of a white powdery substance in brick form, which field-tested positive for the presence of cocaine.

30.  Levesque also opened the other three parcels which contained a total of approximately 39 pounds of marijuana.

31.  On December 3, 2020, I and Detective Levesque reviewed surveillance footage from the Postal Annex and we identified ALLEN as the person shipping the parcels.

### E.   ALLEN Confronts Postal Annex Employee

32.  On the morning of December 2, 2020, B.M., an employee at the Postal Annex store in Menifee where ALLEN had shipped parcels, contacted Detective Levesque to inform him that ALLEN had come into the Postal Annex and confronted B.M. about the status of the parcels ALLEN had shipped in the last week.  B.M. described ALLEN as angry and said that B.M. began to fear for B.M.'s safety.  To calm ALLEN down, B.M. told ALLEN that his parcel was on track to reach its destination.

33.  On December 3, 2020, I interviewed B.M. for further information on ALLEN's activities in relation to the Postal Annex.  B.M. explained to me that ALLEN had been coming in over the last few months and had become a friendly, regular customer who shipped parcels using UPS shipping services.  ALLEN was exceptionally friendly, establishing good rapport with the Postal Annex employees and even providing them with cash gratuities on a regular basis, a practice which B.M. did not

believe was customary.  B.M., not feeling comfortable with the gratuities, used the cash tips she received to purchase coffee for the store employees.

**F.   Riverside PD finds Drugs and Cash at ALLEN's Home and at BIGG's Motel Room**

34.  On December 2, 2020, Detective Levesque and Riverside PD officers executed a search warrant signed by Riverside Superior Court Judge Mac Fisher for ALLEN's home on Swift Street in Menifee, and for BIGGS's motel room at the Quality Inn in Lake Elsinore.

35.  Inside of ALLEN's home, Detective Levesque found a home office which appeared to be a staging area for boxing and preparing parcels for shipment.  Specifically, he found packing material, printers, ink, and shipping labels.  Elsewhere in the house, Detective Levesque discovered four additional bricks of a white powdered substance which field-tested positive for cocaine.  The bricks were bundled like the bricks in the aforementioned parcels and weighed approximately 1,000 grams each.  Inside of a cardboard box, Detective Levesque also discovered a $190,000 of cash bundled inside various envelopes. He also discovered a total of approximately 59 pounds of marijuana.  After performing this search, Detective Levesque and Riverside PD officers found ALLEN and arrested him for drug trafficking.  ALLEN had four iPhones on his person when he was arrested (SUBJECT DEVICES 1, 2, 3, and 4).

36.  At BIGGS's motel room, Riverside PD Officers discovered $4,000 in cash inside of a shoebox which was laying

on the bed, and another $4,600 in cash laying loose on the bed.
Officers also found a gray Apple iPad (SUBJECT DEVICE 5).
Officers also discovered a notepad which appeared to be a
"pay/owe" sheet – a ledger containing various dollar amounts to
track monetary obligations.  Riverside PD then located and
arrested BIGGS.  BIGGS had two Samsung Galaxy phones on his
person when he was arrested (SUBJECT DEVICES 6 and 7).

###### V.   TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING

37.  Based on my training and experience and information
obtained from other law enforcement officers who investigate
drug trafficking, I know the following:

a.   The distribution of drugs is a continuing
criminal activity that occurs over months, and often years.
Drug traffickers often maintain books, receipts, notes, ledgers,
bank records, and other records relating to the manufacture,
transportation, ordering, sale and distribution of illegal
drugs.  The aforementioned records are often maintained where
drug traffickers have ready access to them, such as on their
cell phones and other digital devices, including tablets, such
as ipads.

b.   Drug traffickers use telephones, portable
cellular and digital telephones, pagers, and other communication
devices, sometimes in fictitious and/or other individuals'
names, and maintain in such devices telephone and other contact
information which reflects names, addresses, and/or telephone
numbers of their associates in the drug-trafficking

organization, as well as customers of their drug trafficking
business.

       c.   Drug traffickers often keep records of meetings
with associates, customers, and suppliers on their digital
devices, including in the form of calendar entries and location
data, such as Global Positioning System ("GPS") information,
other locational information, and identifying information about
the trafficker and co-conspirators and the location of previous
drug transactions or stash houses, and/or the identity or
whereabouts of traffickers and co-conspirators involved in
narcotics trafficking.

       d.   Because drug traffickers usually continue to sell
drugs to support themselves until they are arrested, their
communications with various co-conspirators tend to be ongoing
until their arrest.  Communications between people buying and
selling drugs take place by telephone calls and messages, such
as e-mail, text messages, and social media messaging
applications, sent to and from cell phones and other digital
devices.  This includes sending photos or videos of the drugs
between the seller and the buyer, the negotiation of price, and
discussion of whether or not participants will bring weapons to
a deal.  In addition, it is common for people engaged in drug
trafficking to have photos and videos on their cell phones of
drugs they or others working with them possess, as they
frequently send these photos to each other and others to confirm
that they are in possession of the drugs, boast about the drugs,
or facilitate drug sales.  It is also common for drug

traffickers to carry cellular telephones in order to remain in contact with drug suppliers or customers, to communicate with co-conspirators to facilitate drug trafficking, to coordinate the movements of the trafficker and various co-conspirators, and to coordinate the amount of drugs trafficked, as well as payment amounts and methods.  Based on my training and experience, I know that the above-described information can be stored on digital devices carried by drug traffickers.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

38.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

39.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, *inter alia*, is often retrievable from digital devices:

40.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

41.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

42.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

43.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

44.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

45.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's

fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ALLEN's and BIGGS's thumb- and/or fingers on the devices; and (2) hold the devices in front of ALLEN's and BIGGS's face with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

46.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

47.  For all of the reasons described above, there is probable cause to believe that ALLEN and BIGGS committed a

violation of Title 21 United States Code, Sections 841(a)(1), (b)(1)(B)(ii) (possession with intent to distribute at least 500 grams of a mixture or substance containing cocaine) on or about July 29, 2020.

48.  Furthermore, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

                                   /s/ signed pursuant to Fed. R. Crim. P. 4.1
                                   _____
                                   ANTHONY HERRERA JACOBS
                                   U.S. Postal Inspector


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _4th_ day of
December, 2020.

_____
UNITED STATES MAGISTRATE JUDGE